IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 10, 2014

IN THE MATTER OF: CANDICE S.[1]

**Appeal from the Juvenile Court for Williamson County**
**No. 31390     Sharon E. Guffee, Judge**

---

## No. M2013-01750-COA-R3-PT - Filed February 12, 2014

---

Mother's parental rights to her daughter were terminated on the grounds of abandonment by failure to visit and failure to pay support, and persistence of conditions. Mother appeals, asserting that the evidence in support of the grounds is not clear and convincing and that the record does not show that termination of her rights would be in the child's best interest. Finding no error, we affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P. J., M. S.,and FRANK G. CLEMENT, J., joined.

Karen D. Huddleston Johnson, Brentwood, Tennessee, for the appellant, Amanda Y.

Robert E. Cooper, Jr., Attorney General and Reporter, Jordan Scott, Assistant Attorney General, for the appellee, Department of Children's Services.

**OPINION**

Amanda Y. ("Mother") is the mother of one child, Candice S. ("Candice"), born on October 19, 2004. On February 14, 2011, the Tennessee Department of Children's Services ("DCS") filed a dependency and neglect petition in the Williamson County Juvenile Court alleging that Mother had been arrested for driving on a suspended license and simple possession of drugs, that she was under investigation as a member of a crime ring that

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

specialized in check fraud and identity theft, that she had tested positive for benzodiazepines and opiates upon her arrest, and that Candice had been taken into DCS custody on February 12. The court entered a Protective Custody Order on February 14 and, following a hearing on February 15, found probable cause to find Candice dependent and neglected and ordered that she remain in the custody of DCS with Mother to have supervised visitation; an adjudicatory hearing was set for March 15. Following the adjudicatory hearing, the court entered an order providing that Candice remain in the custody of DCS and setting a hearing on the permanency plan for April 16.

The first permanency plan, with goals of "exit custody with kin" and "return to parent" was ratified by order entered May 11. A second plan was prepared on January 25, 2012, and ratified on February 7; the goal of this plan was "return to parent" or "adoption."[2] A third plan was prepared on November 5, 2012, and ratified on February 5, 2013; the goal of this plan was also "return to parent" or "adoption."

DCS filed a petition to terminate Mother's parental rights on December 28, 2012, asserting abandonment by failure to visit or support, substantial non-compliance with the permanency plan and persistence of conditions as grounds. Trial was held on April 22, May 8, and June 17-18, 2013. On July 24, 2013, the court entered an order terminating Mother's parental rights on the grounds of abandonment by failing to visit and support Candice and persistence of conditions.[3]

Mother appeals, stating the following issues:

I. Whether there is clear and convincing evidence to support the termination of parental rights for abandonment for failure to support the child?
II. Whether there is clear and convincing evidence to support the termination of parental rights for abandonment for willful failure to visit the child?
III. Whether there is clear and convincing evidence to support the termination of parental rights for persistence of conditions?

---

[2] Adoption was added as a goal due to Candice being in custody for nine months. Mother did not agree with the goal of adoption.

[3] The termination petition alleged that Bradley C., a resident of Indiana, was Candice's father. During the course of the proceedings, a separate proceeding to establish his paternity of Candice was filed; Mother states in her brief on appeal that his paternity was established and that he voluntarily surrendered his parental rights under separate orders from the trial court. The record before us shows that Father did not participate in the termination of parental rights proceeding and his parental rights are not at issue in this appeal.

IV. Whether the State of Tennessee Department of Children's Services provided reasonable efforts to the mother for the goal of reunification?

V. Whether the termination of parental rights was in the best interest of the child?

## DISCUSSION

### I. STANDARD OF REVIEW

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Terminating a person's parental rights "has the legal effect of reducing the parent to the role of a complete stranger." *In re W.B., IV.*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, *6 (Tenn. Ct. App. Apr. 29, 2005). Pursuant to Tenn. Code Ann. § 36-1-113(h)(1), "[a]n order terminating parental rights shall have the effect of severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian."

Our termination statues identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, 2005 WL 1021618, at *7 (citing Tenn. Code Ann. § 36-1-113(g)). To support the termination of parental rights, petitioners must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine,* 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. Code Ann. § 36-1-113(c).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769; *Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* at 653.

3

In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d at 654. As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

## II. ABANDONMENT

Tenn. Code Ann. § 36-1-113(g)(1) provides that abandonment, as defined at Tenn. Code Ann. § 36-1-102, is a ground to terminate parental rights; the latter statute provides in pertinent part:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

Tenn. Code Ann. § 36-1-102. In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), the court discussed willfulness in the context of termination cases:

The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months. . . . In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child. The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially.

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* at 863–64 (citations and footnotes omitted).

### A. ABANDONMENT BY FAILURE TO SUPPORT[4]

Mother acknowledges that she did not make any child support payments during the four months preceding the filing of the petition but contends that she did not willfully fail to pay support because she was not working and, thereby, did not have the ability to pay support.

The trial court made the following findings relative to the willfulness of Mother's failure to pay support:

Mother admitted in her testimony she was aware of the duty to support and was unsure whether she was paying child support while working at Kmart in Alabama during the Christmas season 2011-2012. Mother never reported to DCS she was unable to work and did report the jobs she had during the course of this case but never paid child support. Her caseworker reminded her to pay child support when they discussed the action steps on the Permanency Plans over the phone. DCS testified Mother was not consistent in bringing food and toys to the visits with the child.

---

[4] Mother's support obligation was $64.76 per week, calculated in accordance with the Tennessee Child Support Guidelines.

* * *

The fact that Mother was able to provide financial support since being released from jail in 2011 is shown through her ability to obtain a job when she wants to. Since the termination petition has been filed, Mother has been consistently employed and paying support. The Court finds Mother's credibility to be lacking and she blames everyone else for matters that clearly are/were in her control. She blames her felony conviction on her inability to obtain employment and transportation issues. The Court simply does not find these to be justifiable excuses for not paying support and clearly while Mother was working in July of 2012 when the second Perm Plan was ratified . . . , Mother was not paying child support.

One of the reasons Mother cites for moving to Knoxville in the August/September of 2012 is the availability of public transportation but she does not obtain a job until the Petition is filed in December 2012. Mother's actions are clearly willful and intentional.

The court was in a unique position to observe Mother and to assess her credibility and summarized Mother's testimony in great detail in holding that Mother's failure was willful. We have reviewed the evidence as well in the context of Mother's argument and, having thoroughly reviewed the record, conclude that the evidence does not preponderate against the trial court's extensive and detailed findings and the holding that the failure to pay support was willful is fully supported by the evidence.

### B. FAILURE TO VISIT

Mother contends that the evidence does not clearly and convincingly support the determination that she willfully failed to visit Candice. She asserts that there was miscommunication with the DCS representatives regarding her efforts to exercise visitation, that she had transportation needs which were not met by DCS, and that she spoke with Candice by phone weekly.

The trial court made the following finding relative to Mother's failure to visit:

Likewise the Court finds the Mother failed to visit the child for a period of four months preceding the filing of the termination petition (August, September, October, November, and most of December). The Court finds it more than coincidental that Mother was to submit to a drug screen during this time period prior to her visits. She tested positive during the home visit in Knoxville. She essentially refused a drug screen when she hung up on Ms.

6

Lee after the missed October visit. Her excuse that she thought phone visits constituted a visit is simply not plausible based on the amount of notice Mother had through her DCS caseworker and court hearings. Again, the Court finds her credibility to be minimal at best blaming everything on the Department when DCS clearly had established a simple protocol for Mother to follow. Since the termination petition has been filed, Mother has miraculously been able to visit every month AND pay for it herself.

Mother does not dispute the court's findings or cite proof to the contrary. We have reviewed the record, particularly the conflicting testimony of DCS caseworker Teara Lee and Mother, once again giving great deference to the court's finding that Mother was not credible. The evidence does not preponderate against the court's findings and its observation that the reasons Mother gave for not exercising visitation in person were not plausible. The evidence clearly and convincingly supports the court's holding that Mother's failure to visit was willful.

## III. PERSISTENCE OF CONDITIONS

Parental rights may be terminated on the basis of "persistence of conditions" as defined by Tenn. Code Ann. § 36-1-113(g)(3)(A) when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

A termination proceeding based on the persistence of conditions ground requires a finding by clear and convincing evidence of all three statutory factors. *In re Valentine*, 79 S.W.3d at 549.

7

In holding that termination on the ground of persistence of conditions was shown by the evidence, the court summarized the proof and stated:

> The Department developed not one but three permanency plans over the course of two years that all addressed this issue and more. After repeated efforts by the Department to assist Mother with the tasks, no progress was made until the Petition for Termination of Parental Rights was filed. DCS provided supervised and therapeutic visitation, a parenting assessment for Mother, drug screens, transportation, hotel, and case management through the family services worker. Mother was given the opportunity for in-patient substance abuse treatment and she refused by leaving the facility.

> Although Mother has made some progress since January 2013 with new housing, a job and school, her living situation is still temporary as she is using student loans to pay her living expenses. Those funds are suspect as she is currently on academic probation. Her rent is paid through July 2013 but after that she is once again in the same unknown circumstances she has been in throughout the life of this case.

> Mother **agreed** to a finding of dependency and neglect at the adjudication of the case. She knew one of the priority outcomes that DCS identified from the very beginning was safe and stable housing. "Parents must take steps to prevent the permanent removal of their children in cases . . . . DCS is not required to do everything for the parent" (*In Re T.M.D.Y.* 2008 Tenn. App. Lexis 210).

> Mother voluntarily chose to move to Alabama after her incarceration in Williamson County in 2011 for family support. Her testimony at trial was she had little family support in Alabama so she decided to voluntarily move to Knoxville where she first said she had friends and support. Later in her testimony she admitted she did not have any support system in Knoxville.

> The Court also finds i[t] very disturbing that Mother is continuing to visit emergency rooms to obtain narcotic pain medication with a known history of substance abuse.

> Additionally, the Court finds it equally disturbing that Mother has the ability and resources to pack up and move to a city further away from her daughter, arrange financial support to start college, get a job and not put those same resources toward reuniting with her daughter. It is clear to the Court

8

Mother has always put her needs above her child's as evidenced in Dr. Kaforey's parenting assessment in December 2012 . . . . "When Amanda was released from jail, instead of finding housing and work in Nashville or the surrounding area, she went to Alabama and then to Knoxville because of comfort. She moved away from her daughter and her chance to establish consistent visitations. It has only been recent(ly) that she got a job and CM Lee reports Amanda still struggles with a consistent place to stay."

\* \* \*

Despite Mother's attorney impressively advocating for her, Mother's attempts at rehabilitation have come much too late. As in *In Re: T.M.D.Y.*, "based upon mother's history of her failure to follow through with having a safe, stable and appropriate placement for the child, there is little likelihood she will continue to maintain a safe, stable and appropriate placement for the child, there is little likelihood she will continue to maintain a sound environment free of dependency and neglect of the child." DCS has proven this ground by clear and convincing evidence.

Much of Mother's argument is directed toward efforts she made following the filing of the petition and immediately prior to trial to improve her living circumstances; she does not seriously contest the trial court's factual findings or cite to contrary evidence. The evidence shows that in the two years that Candice had been in DCS custody, Mother failed to remedy the conditions which led to her removal. The permanency plans identified specific areas of concern relative to the conditions and DCS offered Mother assistance in addressing those conditions; DCS is not, however, a substitute for Mother's own initiative. Mother's situation did not appreciably change and showed no realistic prospect that it would change. The evidence clearly and convincingly supports the termination of Mother's rights on the ground of persistence of conditions.

## IV. REASONABLE EFFORTS

Mother contends that DCS did not provide reasonable efforts to assist her in reunifying with Candice. She specifically complains that DCS did not assist her in obtaining housing, parenting education, or employment while she was living in Alabama or when she relocated to Knoxville.

Reasonable efforts are defined by statute as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). The factors the courts are to use to determine reasonableness include:

9

(1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Tiffany B*., 228 S.W.3d at 148, 158--59 (citing *In re Giorgianna H*., 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006)) (footnote omitted). While the Department does not have to exert herculean efforts, it must do more than "rely on parents to facilitate their own rehabilitation." *In re A. R*., No. M2007-00618-COA-R3-PT, 2007 WL 4357837, at *5 (Tenn. Ct. App. Dec. 13, 2007) (citing *In re M. B*., No. M2006-02063-COA-R3-PT, 2007 WL 1034676, at *5 (Tenn. Ct. App. Mar. 30, 2007)).

DCS' responsibilities were set forth in the permanency plans; the record shows that Mother was present in person or by phone when each plan was developed and that, on the plans prepared when Mother was present in person, she checked "yes" to the statement "I agree with the permanency plan." To the extent she had concerns about DCS' efforts, she failed to express them when given the opportunity. As noted earlier, the trial court detailed in the final order efforts DCS expended to assist Mother in implementing the permanency plans; Mother does not contest those findings or cite to contrary evidence. The testimony and other evidence pertinent to this issue clearly and convincingly shows that DCS provided reasonable efforts to assist Mother.

## V. BEST INTEREST

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. The Legislature has set out a list of factors at Tenn. Code Ann. § 36-1-113(i) for the courts to follow in determining the child's best interest.[5] The list of factors is not exhaustive, and the

---

[5] The factors at Tenn. Code Ann. § 36-1-113(i) are:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment

statute does not require every factor to appear before a court can find that termination is in a child's best interest. *See In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *State of TN Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

The trial court based its holding that termination of Mother's rights was in Candice's best interest on statutory factors 1, 2, 4 and 5.[6] In her brief, Mother cites to evidence

does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

[6] The court held:

1) Mother has not made such an adjustment of her circumstances, conduct, or conditions as to make it safe and in the child's best interest to be in the Mother's home. As stated above, throughout the course of this case Mother has not had stable housing or income. It has not been until the last few months that Mother's circumstances have somewhat improved but the Court considers this temporary.

2) Mother has failed to effect a lasting adjustment despite reasonable efforts by the Department of Children's Services, counseling, parenting classes x three, Kid's First therapeutic visitation, and it has been for such a duration of time that a lasting adjustment does not reasonably appear possible.

4) Mother has not established a meaningful relationship with the child despite regular supervised visits for the last five months. The child clearly does not wish to speak to Mother on a regular basis and has not throughout these proceedings. While it is certain that

11

pertinent to other factors as well as evidence which she contends conflicts with that relied upon by the court.

We have addressed many of the matters relied upon by Mother in support of her insistence that termination of her rights is not in Candice's best interest in our discussion in which we affirmed the findings of the grounds for termination. For the same reasons, we hold that they support the holding that termination of Mother's rights is in Candice's best interest.

The evidence does not preponderate against the court's findings and, considering the record as a whole, particularly including the court's credibility findings relative to Mother and its related consideration that any improvement shown by Mother was temporary, clearly and convincingly shows that termination of Mother's rights is in Candice's best interest.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court terminating Mother's parental rights.

_____
RICHARD H. DINKINS, JUDGE

---

visits in a DCS office are not an optimal environment, Mother made little to no efforts to improve this arrangement.

5) A change of caretakers and physical environment is likely to be detrimental to the child at this time. The child was in the same foster home for over two years. She recently has been placed in a preadoptive home where it is clear the child has bonded with her foster parents. (She still sees her former foster mother as they are all friends). Her current family wants to adopt her and obviously care and love her very much. DCS testified the child has a strong bond with her foster father, calls him "daddy" and needs to be released from the stigma of foster care.

12